# United States Court of Federal Claims

No. 09-675 C
(Filed Under Seal: February 03, 2010)
(Reissued: March 23, 2010)<sup>*</sup>

_____

| | |
|---|---|
| **MADISON SERVICES, INC.,** | Bid Protest; Negotiated Procurement; Cancellation; FAR 15.206(e); FAR 15.305(b); APA Standard of Review; Rational Basis; Presumption of Regularity and Good Faith |
| *Plaintiff,* | |
| v. | |
| **UNITED STATES OF AMERICA,** | |
| *Defendant.* | |

_____

*Wayne A. Keup*, Wayne A. Keup, PLLC, Washington, DC, for plaintiff.

*Devin A. Wolak*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**BLOCK,** *Judge.*

As the once-presumptive awardee in a now-cancelled negotiated procurement by the Federal Emergency Management Agency ("FEMA"), plaintiff, Madison Services, Inc. ("Madison"), challenges the agency's cancellation decision. For the reasons set forth below, the court finds FEMA's cancellation of the procurement to be founded upon a reasonable basis, adequately documented in the administrative record, thus placing the decision squarely within the agency's discretion. Accordingly, the court denies the protest.

### I. FACTUAL AND PROCEDURAL BACKGROUND

A sinuous path has led this pre-award protest to its current, and final, juncture. The court's previous opinion in this matter, *Madison Services, Inc. v. United States*, __Fed. Cl. __, 2009 WL 5251950 (2009) ("*Madison I*"), offers a fuller account of this factual and procedural history, but a brief overview is useful here.

_____

<sup>*</sup> *See* Appendix.

On April 10, 2009, FEMA issued Request For Proposals No. HSFEHQ-09-R-0046 (the "RFP" or "solicitation"). Administrative Record ("AR") 325–434. After the close of bidding and evaluation of all offers, FEMA informed Madison that it was the intended awardee. Compl. ¶ 21. However, FEMA's reconsideration of its tentative award decision, precipitated by a legal challenge to the solicitation, along with the agency's ultimate reassessment of its long-term needs, would thus far deny plaintiff its prize.

This series of unfortunate events (at least from plaintiff's perspective) began on June 26, 2009, when TMI Management Systems, Inc. ("TMI"), a FEMA contractor providing services similar to those sought in the RFP, AR 688, filed a protest with the Government Accountability Office ("GAO"). *TMI Mgmt. Sys., Inc.*, B-401530, 2009 CPD ¶ 191 (Comp. Gen. Sep. 28, 2009). GAO ultimately sustained TMI's protest, and recommended that FEMA reissue the solicitation. *Id.* at *4. Nine days later, Madison hastily filed its original complaint with this court, seeking to enjoin FEMA from following GAO's recommendation. Compl. ¶ 31. Defendant promptly moved to dismiss the complaint on ripeness grounds, arguing that FEMA had yet to decide upon its course of action. Def.'s Mot. to Dismiss at 7.

On November 4, 2009, FEMA reached its final decision, opting not to reissue the solicitation, but to cancel it altogether. AR 765. Defendant then renewed its motion for dismissal, arguing that the cancellation had rendered the protest moot, Def.'s Renewed Mot. to Dismiss at 3–4, while plaintiff filed a supplemental complaint challenging the cancellation, Suppl. Compl. ¶¶ 25–42. Defendant then moved to dismiss that filing. Def.'s Opp'n to Pl.'s Mot. to Amend at 1. In *Madison I*, the court dismissed plaintiff's challenge to FEMA's reissuance plans on justiciability grounds. 2009 WL 5251950 at *5. In addition, finding that plaintiff had standing to challenge the cancellation decision, the court granted plaintiff's motion to supplement the complaint, thus allowing the protest to proceed to its current juncture. *Id.* at *8.

*A. The Solicitation*

The April 2009 solicitation sought on-site facility support services for FEMA's temporary housing unit ("THU") program. AR 352. FEMA-managed THU sites fall into two categories, Temporary Housing Storage Sites ("THSS") and Temporary Housing Staging Areas ("THSA"), which are used, respectively, for THU storage and disposal. *Id.* According to the terms of the solicitation, the prospective contractor would provide support services to these sites on a contingency basis, pursuant to task orders issued under an indefinite-delivery, indefinite quantity ("IDIQ") contract. AR 374. Contractor compensation would be on either a "firm-fixed-price" or a "cost-plus-fixed fee" basis, depending on the type of task order, AR 353, and a forty-hour work-week would be required, with no allocation for overtime pay, AR 357. Finally, the solicitation incorporated, by reference, FAR 52.215-1(f)(2), which provides that the "Government may reject any or all proposals if such action is in the Government's interest." AR 413.

Under the prospective IDIQ contract, FEMA would not commit to the purchase of any particular quantity of supplies or services. AR 374. Rather, the solicitation identified fifteen THU sites (four THSS, eleven THSA), located across six states in the eastern United States, where the

prospective contractor would potentially be required to provide needed support services. AR 356–57 ("Statement of Work"). FEMA's work-force projections indicated that up to 400 full-time contractor employees would be required for "direct site support," and up to 300 employees would be required for "short-term and special interim projects." AR 357 ("Anticipated Level of Effort"). Conversely, prospective offerors were on notice that some of the THU sites "may close or may be consolidated during the period of performance of a task order." AR 368. During the question and answer phase of the procurement, FEMA informed prospective offerors that it was "developing a disposal and closure plan that is subject to change," and the agency provided no specific time-table for potential site closures. AR 332.

### *B. The Cancellation*

Nearly seven months after issuance of the solicitation—with no contract award yet made—the "THU program ha[d] undergone significant changes," according to the Logistics Management Directorate ("LMD"), FEMA's program office. AR 763. On October 28, 2009, LMD issued a memorandum requesting cancellation of the solicitation, due to "changes in the scope of THU operations and an accelerated site closure schedule." *Id*.; *see* Def.'s Mot. for J. at 6. LMD noted that the "solicitation's original requirements were based upon operating 14 or 15 full time sites, and assumed that a contractor would provide a significant percentage of the day-to-day workforce." *Id*. LMD indicated, however, that "recent policy changes," since issuance of the April 2009 solicitation, would permit an "accelerated site closure plan." *Id*. As a result, FEMA would require contractor services for only [*number redacted*] THSS sites, instead of the originally anticipated four THSS and eleven THSA sites. *Id*. In furtherance of its new policy, the agency also "hired a significant number of FEMA employees to fulfill the daily operational roles, significantly reducing any requirement for contractor provided baseline services." *Id*. Accordingly, LMD requested that the contracting officer "re-solicit the workforce contract" for a service area limited to "the [*number redacted*] enduring sites." *Id*.

Based on the LMD memorandum, the contracting officer concluded that the original "solicitation does not [now] accurately reflect the FEMA's requirements." AR 765 ("Cancellation Notice"). The contracting officer rejected the device of simply amending the solicitation, however, because she concluded that "an amendment . . . would be so substantial as to exceed what prospective offerors reasonably could have anticipated," and thus would "preclude those sources who likely would have submitted offers had the substance of the amendment been known to them." *Id*. Accordingly, on November 4, 2009, the contracting officer cancelled the solicitation. *Id*.

### *C. The Protest*

Plaintiff contends that "offerors were put on notice in the original solicitation that . . . the [site] closures and potential reductions whenever they occurred, were within the scope of the contract." Pl.'s Mot. for J. at 14. Plaintiff argues that the solicitation thus contemplated the possibility of the very site closures and work-force reductions recited in the LMD memorandum, and that only the timing of the site closures has changed since issuance of the solicitation. *Id*. at 8–9, 13–14. In turn, according to plaintiff, the contracting officer had no basis for concluding that an amendment to the solicitation would be so substantial as to exceed what prospective offerors

reasonably could have anticipated, or that such an amendment would exclude additional offerors from competition. *Id*. at 9, 14. On that basis, plaintiff alleges that FEMA's cancellation of the solicitation lacks a rational basis (and, indeed, any basis), *id*., and is in violation of federal regulation, Pl.'s Opp'n to Def.'s Mot. for J. at 7.

Alternatively, plaintiff argues that defendant is using the prospect of enhanced competition as a subterfuge, in an attempt to hide FEMA's true, illicit motive. Pl.'s Mot. for J. at 15. In particular, plaintiff contends that FEMA cancelled the solicitation either "to avoid the burden of litigation," *id*., or "to divert the THSA work from Madison . . . and improperly award it on a sole source basis to the incumbent" contractor, *id*. at 9. In essence, plaintiff is alleging bad faith on the part of defendant and its agency. In support of this allegation, plaintiff relies upon an October 2009 congressional staff report. *Id.* at 5–6, Ex. 1 (MINORITY STAFF OF H.R. COMM. ON TRANSPORTATION AND INFRASTRUCTURE, 111TH CONG., STAFF ANALYSIS OF FEMA'S TEMPORARY HOUSING: FOUR YEARS AFTER KATRINA THOUSANDS OF TRAILERS REMAIN IN STORAGE (Comm. Print 2009)).[1] Plaintiff contends that the congressional staff report—discussing past delays in the disposal of FEMA's THU inventory—belies the feasibility of FEMA's current plans, as recited in the LMD memorandum, for accelerated THU site closures, as well as the *bona fides* of the memorandum itself. *Id*. at 12.

The matter is now before the court on the parties' cross-motions for judgment on the administrative record, pursuant to Rule 52.1 of the RULES OF THE COURT OF FEDERAL CLAIMS.

## II. DISCUSSION

The 1996 amendments[2] to the Tucker Act grant the court "jurisdiction to render judgment on an action by an interested party objecting to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). The court is to review the challenged agency decision pursuant to the standard set forth in section 10(e) of the Administrative Procedure Act ("APA"). 28 U.S.C. § 1491(b)(4) (incorporating 5 U.S.C. § 706); *see Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) ("*Impresa*"). Pursuant to the APA standard, the court must determine if the agency decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). This standard may be distilled to the two-fold inquiry of whether the agency decision (1) lacks a rational basis, or (2) involves a violation of statute or regulation. *Impresa*, 238 F.3d at 1332–33. Accordingly, a reviewing court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, . . . and the disappointed bidder bears a heavy burden of showing that the [agency's] decision had no rational basis." *Id.* at 1333 (internal quotation marks and citations omitted). Alternatively, "a claimant must show a clear and prejudicial violation of applicable statutes or regulations." *Id.*

This is a highly deferential standard of review, and the Supreme Court has cautioned that the "court is not empowered to substitute its judgment for that of the agency." *Citizens to Pres. Overton*

---

[1] *See* http://republicans.transportation.house.gov/news/PRArticle.aspx?NewsID=743.
[2] *See* Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870 (1996).

*Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). This is especially true in the context of a negotiated procurement, where "the regulations entrust the contracting officer with *especially great discretion*, extending even to his application of procurement regulations." *Am. Tel. & Tel. Co. v. United States*, 307 F.3d 1374, 1379 (Fed. Cir. 2002) (emphasis added). Greatest perhaps is the contracting officer's discretion when deciding to *cancel* a negotiated procurement, "especially where, as in this case, the solicitation itself explicitly permits the agency to make no award at all." *Cygnus Corp., Inc. v. United States*, 72 Fed. Cl. 380, 385 (2006); *see Am. Gen. Leasing, Inc. v. United* States, 587 F.2d 54, 58–59 (Cl. Ct. 1978) ("It is settled law that no assurance exists that [a] contractor will receive an award and that the Government retains, in its discretion, the right to reject all bids without liability, even after there have been extensive negotiations with a bidder."). And, as courts have repeatedly observed, the greater the discretion entrusted to the contracting officer by applicable statutes and regulations, the higher the threshold for finding the officer's decision irrational or otherwise unlawful. *E.g.*, *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004); *Burroughs Corp. v. United States*, 1617 F.2d 590, 597 (Cl. Ct. 1980); *Cygnus*, 72 Fed. Cl. at 384–85.

### *A. The Cancellation Has a Rational Basis and Is Otherwise in Accordance with Law*

Though entrusted to the contracting officer's broadest discretion, the decision to cancel a negotiated procurement remains subject to the court's review, pursuant to 28 U.S.C. § 1491(b) and the APA standard, and may be set aside if ultimately found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See FFTF Restoration Co. v. United States*, 86 Fed. Cl. 226, 244 (2009) ("*FFTF*"). The agency's cancellation decision must, therefore, be supported by a rational basis. *E.g.*, *id.* at 245; *Wetsel-Oviatt Lumber Co. v. United States*, 43 Fed. Cl. 748, 753 (1999).

Ordinarily, a rational basis for a procuring agency's decision is necessary, but *not sufficient* to ensure compliance with applicable law. Thus, an agency decision, even if rational, may yet be shown to violate applicable statutes or regulations. *See Impresa*, 238 F.3d at 1332–33. An apt example is the cancellation of a procurement conducted via sealed bidding, which, after the opening of bids, must be supported by a "compelling" reason. FAR 14.404-1(a)(1). However, as explained below, the regulatory standards for the cancellation of a negotiated procurement are so extraordinarily permissive that they impose no constraints upon a contracting officer's discretion beyond what reasoned judgment requires.

In particular, the Federal Acquisition Regulation ("FAR") recites two standards that govern the cancellation of a negotiated procurement. First, the FAR provides broadly that "[t]he source selection authority may reject all proposals received in response to a solicitation, if doing so is in the best interest of the Government." FAR 15.305(b).[3] The court has previously found that a rational

---

[3] As the court noted in *FFTF*, there is no meaningful distinction between the decision to "reject all bids" or to "cancel the entire solicitation." Accordingly, FAR 15.305(b) is fairly read to provide a general standard governing the cancellation of a negotiated procurement, whether because no proposal met the government's needs or because those needs themselves have changed. *See FFTF*, 86 Fed. Cl. at 237 n.15.

basis for cancellation is sufficient to establish a procuring agency's compliance with FAR 15.305(b). *DCMS-ISA, Inc. v. United States*, 184 Fed. Cl. 501, 513–14 (2008).

Second, and most pertinent to the instant protest, FAR 15.206(e) provides that:

> *If, in the judgment of the contracting officer, based on market research or otherwise*, an amendment proposed for issuance after offers have been received is so substantial as to exceed what prospective offerors reasonably could have anticipated, so that additional sources likely would have submitted offers had the substance of the amendment been known to them, the *contracting officer shall cancel the original solicitation* and issue a new one, regardless of the stage of the acquisition.

(emphasis added).  Significantly, the ostensible mandate of FAR 15.206(e)—that a contracting officer "shall" cancel the original solicitation—is conditional upon a determination that is left to the "judgment of the contracting officer," i.e., the officer's discretion. *Id*. To be sure, this does not leave the regulation vacuous.  Should a contracting officer reach the conclusion that a proposed amendment is "so substantial . . . that additional sources likely would have submitted offers had the substance of the amendment been known to them," FAR 15.206(e) does dictate the contracting officer's course of action. *Id*. And this triggering determination by the contracting officer must have some basis in "market research or otherwise." *Id*.

Clearly, however, in order to invoke FAR 15.206(e) in support of her decision to cancel a negotiated procurement, a contracting officer need only have a *reasonable basis* for concluding that a proposed amendment rises to the level contemplated by the regulation. Conversely, a reasonable basis for reaching the opposite conclusion suffices to exempt the contracting officer from the regulation's ostensible command.  Finally, FAR 15.206(e) does not purport to exhaust the circumstances under which cancellation is permissible, and thus does not intrude upon the contracting officer's broad discretion to cancel a negotiated procurement when "doing so is in the best interest of the Government."  FAR 15.305(b).

In the final analysis, therefore, in order for the cancellation of a negotiated procurement to withstand judicial scrutiny, under the APA standard of review, the procuring agency need only provide "a coherent and reasonable explanation of its exercise of discretion." *Impresa*, 238 F.3d at 1333 (internal quotation marks omitted).  Put another way, as applied to the cancellation of a negotiated procurement, the APA standard reduces to nothing more than rational-basis review.[4]

**1. The Cancellation Has a Rational Basis**

Plaintiff contends that the solicitation contemplated the very site closures and work-force

---

[4] Of course, the cancellation of a negotiated procurement, like *any* procurement-related decision, must also comply with overarching regulatory requirements of integrity, honesty, and impartial treatment of all prospective contractors.  *See* FAR 1.102(b)(3); FAR 1.102-2(c)(3).  The standard of review for compliance with these regulatory provisions, however, likewise "amounts to a rational basis test." *FFTF*, 86 Fed. Cl. at 245 n.29.

reductions recited in the LMD memorandum, and that only the timing of the site closures has changed since issuance of the solicitation. Pl.'s Mot. for J. at 8–9. Plaintiff thus argues that the contracting officer could not reasonably conclude that the changes in FEMA's requirements exceed what prospective offerors reasonably could have anticipated, or that an amendment would be so substantial, within the meaning of FAR 15.206(e), as to exclude additional offerors from competition. *Id*. The court disagrees.

The LMD memorandum documents three changes in FEMA's requirements. First and foremost, due to an "accelerated site closure plan," FEMA's needs for contractor-provided services are now limited to [*number redacted*] THU sites. AR 763. The LMD memorandum identifies the locations of these "[*number redacted*] enduring sites." *Id*. Second, the memorandum notes that FEMA has "hired a significant number of FEMA employees to fulfill the daily operational roles, significantly reducing any requirement for contractor provided baseline services." *Id*. Finally, the memorandum requests that a number of changes be made to the contractor compensation scheme in the new solicitation. AR 763–64.

The court finds critical the reduction in the number of THU sites where the agency now requires contractor services. *See* AR 763. The solicitation identified fifteen THU sites and anticipated that FEMA would require the services of up to 400 full-time contractor employees for "direct site support" and up to 300 employees for "short-term and special interim projects." AR 356–57. By the same token, the solicitation warned of an unspecified number of site closures, AR 368, and projected that as few as 75 full-time contractor employees might prove sufficient, AR 357. The prospective awardee thus could not rely upon receiving any particular volume of business under its contract with FEMA, and the margin of this uncertainty was high. As plaintiff points out, the solicitation described "an IDIQ contingency contract with actual requirements impossible to determine at the time of formation." Pl.'s Mot. for J. at 3. FEMA's plans for accelerated THU site closures have now substantially reduced this margin of uncertainty, limiting the agency's need for contractor services to a *maximum* of [*number redacted*] THU sites, instead of the originally anticipated fifteen. AR 763. In addition, the agency has hired "a significant number" of its own employees to provide the daily services at the active sites. *Id*. This drastic reduction in the number of THU sites, combined with an increase in the number of FEMA employees on hand, naturally entails a commensurate reduction in the *maximum* work force that a prospective contractor will have to provide.

It is reasonable to conclude that many contractors—those incapable of servicing the originally anticipated fifteen THU sites or supplying up to 400 full-time employees—would have been reticent to expend time and money in responding to a solicitation that contemplated a volume of work beyond their capacity. At least some of those contractors, however, may respond to a new solicitation that is expressly limited to FEMA's more decided and more decidedly modest needs. Thus, a new solicitation would permit those additional contractors to compete for the government's business, whereas an amendment would exclude them from competition. Accordingly, the court finds reasonable the contracting officer's conclusion that the changes in FEMA's requirements "were so substantial" that merely amending the solicitation would "preclude those sources who likely would have submitted offers had the substance of the amendment been known to them." AR 765.

Plaintiff insists that "offerors were put on notice in the original solicitation that . . . the [site] closures and potential reductions whenever they occurred, were within the scope of the contract." Pl.'s Mot. for J. at 14; Opp'n to Def.'s Mot. for J at 3–4. Plaintiff is correct. *See, e.g.*, AR 332, 368, 374. However, this does not render the changes in FEMA's requirements necessarily insubstantial within the meaning of FAR 15.206(e), nor does it prove unreasonable the contracting officer's decision to cancel the solicitation. For, even if plaintiff could persuade the court that proceeding with an amended solicitation would have been a reasonable or even better course of action, this would not disprove the reasonableness of the contracting officer's decision to cancel the solicitation. It is axiomatic that the demonstrated rationality of one possible conclusion does not negate the rationality of the alternative or even opposite conclusion. After all, reasonable minds can and do differ. *See, e.g.*, *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) ("If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion."); *NLRB v. Roll & Hold Warehouse & Distrib. Corp.*, 162 F.3d 513, 517 (7th Cir. 1998) ("We will not overturn the agency's findings merely because we find the opposite conclusion more reasonable."). Therefore, though a different conclusion *might* have been reasonable, the court finds reasonable the conclusion that the contracting officer did reach, namely, that a new solicitation, limited *ab initio* to a more modest scope of work, would garner interest from a larger pool of contractors, thus leading to increased competition.

### 2. The Cancellation Does Not Violate FAR 15.206(e)

Plaintiff's second ground for challenge begins with the false premise that a "Government decision to cancel a solicitation for a negotiated procurement *must* meet the requirements of FAR §15.206(e)." Pl.'s Mot. for J. at 8 (emphasis added). Plaintiff further contends that no "market research or other research [was] performed as required by the FAR." Pl.'s Opp'n to Def.'s Mot. for J. at 2. Plaintiff concludes that "[s]ince the [LMD] Memorandum on which the cancellation was based fails to establish any of the required elements in FAR §15.206(e), the cancellation violates federal regulations." *Id.* at 7. This conclusion, however, rests upon a fundamental misconstruction of the requirements and scope of FAR 15.206(e).

First, as explained above, all that FAR 15.206(e) requires is a reasonable basis for the contracting officer's decision, which requirement FEMA has met. Moreover, plaintiff's assertion that this reasonable basis must include some form of "research" is incorrect. The phrase "based on market research or otherwise," FAR 15.206(e), is naturally read to mean "based on market research or otherwise based," not, as plaintiff seems to believe, "based on market research or other research." *See, e.g.*, *VSE Corp.*, B-290452.2, 2005 CPD ¶ 111, *5–6 (Comp. Gen. Apr. 11, 2005) (no research required in order for the cancellation of a negotiated procurement to comply with FAR 15.206(e), where the "agency's *assumption* that additional firms may well be interested in . . . a solicitation reflecting the agency's current requirement, with the result that competition may be increased, is reasonable." (emphasis added)).

Second, and equally important, the cancellation of a negotiated procurement is not exclusively governed by FAR 15.206(e). Section 15.206 predominantly addresses the circumstances that require a contracting officer to amend a solicitation; subsection (e) carves out a narrow exception when cancellation and re-solicitation, rather than amendment, may be required.

Specifically, this exception requires cancellation where a proposed amendment would be "so substantial as to exceed what prospective offerors reasonably could have anticipated." FAR 15.206(e). Accordingly, the contracting officer's *failure* to cancel a negotiated procurement would violate FAR 15.206(e), if based upon the unreasonable conclusion that a proposed amendment would have been anticipated by prospective offerors. Nothing in the language of FAR 15.206(e), however, precludes the cancellation of a solicitation in response to more modest changes in a procuring agency's requirements, nor does this subsection otherwise exhaust the circumstances under which the contracting officer is *permitted* to cancel a negotiated procurement.

To be sure, an agency's explanation for its cancellation decision may not support the agency's claim that cancellation was *required* by FAR 15.206(e). However, such cancellation—so long as it is rationally based—could not be said to *violate* FAR 15.206(e). The only other regulatory standard governing the cancellation of a negotiated procurement is that of FAR 15.305(b), which simply requires that cancellation be in the "best interest of the Government." As already noted, this extraordinarily permissive standard requires nothing more than a reasonable basis for the cancellation decision.

Here, the administrative record evinces such a reasonable basis, one that supports not only a discretionary cancellation decision, consistent with the FAR 15.305(b), but likewise supports the conclusion that the changes in FEMA's requirements rise to the level contemplated by FAR 15.206(e).

### *B. Plaintiff's Unfounded Allegations Fail To Rebut the Presumption That the Cancellation Was Made in Good Faith*

A strong presumption of regularity and good faith conduct attaches to any rational agency decision. *See Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239–41 (Fed. Cir. 2002) ("*Am-Pro*"). The court's review is thus guided by the "well-established principle that contracting officials are presumed to act in good faith when executing their procurement functions." *Aero Corp. v. United States*, 38 Fed. Cl. 408, 413 (1997); *see Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d 1578, 1581 (Fed. Cir. 1995) ("We assume the government acts in good faith when contracting."). Indeed, for over 50 years, "this court and its predecessor have repeated that we are loath to find to the contrary of good faith" on the part of government officials, "and it takes, and should take, well-nigh irrefragable proof to induce us to do so." *Am-Pro.*, 281 F.3d at 1239 (internal quotation marks omitted); *Knotts v. United States*, 128 Ct. Cl. 489, 492 (1954).[5]

Accordingly, a plaintiff's allegations of bad faith must rest upon "clear and convincing evidence." *Am-Pro*, 281 F.3d at 1239–40 (equating the traditional standard of "irrefragable proof" with "clear and convincing evidence"). This is a difficult standard of proof to satisfy, one that the

---

[5] The presumption of regularity and good faith first attached, more than 100 years ago, to the government's exercise of its judicial and police powers. Although its extension to the government's conduct in the commercial sphere was arguably forced, the presumption is now a "fixture" of federal procurement law and the APA standard of review. *See Orion Int'l Techs. v. United States*, 60 Fed. Cl. 338, 344 n.14 (2004).

Federal Circuit has repeatedly declared is "equated with evidence of some specific intent to injure the plaintiff." *Id.* at 1240 (internal quotation marks and citations omitted); *Galen Med. Assocs., Inc.*, 369 F.3d at 1330 (same); *see Caldwell & Santmyer, Inc.*, 55 F.3d at 1581.

To be sure, the requisite clear and convincing evidence need not reside within the four corners of the administrative record; such a requirement would turn the presumption of good faith into a foregone conclusion, save against "officials who are both sinister *and* stupid." *Beta Analytics Int'l, Inc. v. United States*, 61 Fed. Cl. 223, 226 (2004). Accordingly, the court has "traditionally considered extra-record evidence in assessing alleged bias or bad faith." *Int'l Res. Recovery, Inc. v. United States*, 61 Fed. Cl. 38, 42 (2004); *see J.C.N. Constr. Co. v. United States*, 60 Fed. Cl. 400, 405 n.8 (2004) (allowing plaintiff to supplement the record with "documentary evidence tending to support its bias and *de facto* debarment claim"). A party may also "rely on extra-record evidence to support its claim that discovery regarding bad faith conduct is necessary." *Beta Analytics*, 61 Fed. Cl. at 226.

Nevertheless, a plaintiff who seeks to prove its allegations of bad faith entirely through extra-record evidence must contend with the stringent standard for supplementation of the administrative record. *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379–81 (Fed. Cir. 2009) ("*Axiom*"). In applying the APA standard, the "focal point for judicial review should be the administrative record already in existence, not some new record made initially with the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *see Fla. Power & Light v. Lorion*, 470 U.S. 729, 743–44 (1985). Thus, the court may consider extra-record evidence only when failure to do so would "frustrate effective judicial review." *Axiom*, 564 F.3d at 1381 (quoting *Pitts*, 411 U.S. at 142–43). This limited evidentiary scope serves to guard against converting the highly deferential APA standard of review into effectively *de novo* review of the merits of the agency's decision. *Id.* at 1380 (citing *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000)). In *Axiom*, the Federal Circuit signaled a more restrictive approach to the consideration of extra-record evidence, and repudiated reliance on categorical exceptions to the Supreme Court's edict that judicial review should be confined to "the record the agency presents to the reviewing court." *Id.* at 379–81 (quoting *Fla. Power & Light*, 470 U.S. at 743–44); *see PlanetSpace Inc. v. United States*, 90 Fed. Cl. 1, 4–5 (discussing the context and significance of the *Axiom* decision).

Thus, "allegations of bad faith must be based on hard facts in order to justify . . . supplementation of the administrative record." *Int'l Res. Recovery*, 61 Fed. Cl. at 43. This is especially true where the procuring agency has provided for its decision a reasonable explanation, borne out by an administrative record that otherwise appears complete. In such instance, the proffered extra-record material must indicate some personal animus or bias on the part of agency officials, reveal a latent inconsistency in the existing record, or otherwise give some indication that the agency's explanation is pretextual. Absent this threshold showing, a plaintiff's bare allegations of bad faith are insufficient to place the issue or the proffered extra-record evidence before the court. *Cf. Beta Analytics*, 61 Fed. Cl. at 226 (considering plaintiff's request for discovery on the issue of bad faith, and holding that "to put facts relating to bad faith in play a plaintiff must first make a threshold showing of either a motivation . . . or conduct that is hard to explain absent bad faith").

Plaintiff alleges that FEMA is using the prospect of enhanced competition as a pretext. Pl.'s Mot. for J. at 9. In particular, plaintiff contends that "in the guise of enhancing competition," FEMA seeks either to divert the work to the incumbent contractor on a sole-source basis, *id*., or simply to avoid the burden of litigation, *id*. at 15. Unmistakable are plaintiff's insinuations that the LMD memorandum is all but a fabrication. For example, plaintiff characterizes the LMD memorandum as "deliberately ambiguous," Pl.'s Opp'n to Def.'s Mot. for J. at 5, and refers to the "allegedly" accelerated schedule for site closure, Pl.'s Mot. for J. at 12. Curiously, perhaps in an attempt to evade the stringent standard of proof, plaintiff assiduously avoids using the words "bad faith" except when arguing that bad faith is "not essential to establish that a cancellation was a pretext." Pl.'s Opp'n to Def.'s Mot. for J. at 8. For this untenable proposition, plaintiff cites *Klinge Corp. v. United States*, 83 Fed. Cl. 773, 780 (2008). *Id*. Of course, the opposite is true: *Klinge* uses "pretext" and "bad faith" interchangeably. *Klinge*, 83 Fed. Cl. at 776. And bad faith is precisely what plaintiff alleges.

In support of its allegation, plaintiff points to nothing in the administrative record, but instead relies upon the October 2009 congressional staff report, which it attached as an exhibit to its motion for judgment. *See* Pl.'s Mot. for J. at 5–6, Ex. 1. Before the court may consider this extra-record evidence, however, plaintiff must demonstrate that the congressional report points to an improper motive or otherwise supports an inference of bad faith.[6] Based on the excerpts quoted by plaintiff in its motion for judgment, the report apparently documents FEMA's slow progress in disposing of its THU inventory "through fiscal year 2009." *Id*. at 6. This slow progress was apparently due to a combination of the agency's "own policy" and a court order prohibiting the disposal of "approximately 80% of the [agency's] current THU inventory pending disposal." *Id*. Notably, this court order expired on January 1, 2010. *Id*. This is the sum total of what, according to plaintiff, is the damning content of the report.

Yet, as defendant rightly notes, FEMA's "past performance does not necessarily predict future results." Def.'s Opp'n to Pl.'s Mot. for J. at 8. FEMA's past difficulties neither undermine the feasibility of the agency's plans for future site closures nor belie the veracity or good faith of the agency's recent policy changes. *See* AR 763. Therefore, upon plaintiff's own characterization of its contents, the congressional staff report provides no indication whatsoever that FEMA's explanation for its cancellation decision is pretextual, or that defendant or its agency have otherwise acted in bad faith. Plaintiff has thus failed to make the threshold showing necessary to place its proffered extra-record evidence before the court.

---

[6] Plaintiff asks the court to "take judicial notice of this publicly available" congressional staff report. Pl.'s Mot. for J. at 6 n.2 (citing *Global Computer Enters., Inc. v. United States*, 88 Fed. Cl. 52, 70 (2009)). While the congressional staff report may qualify for judicial notice, pursuant to Rule 201 of the FEDERAL RULES OF EVIDENCE, this does not exempt plaintiff from having to meet the *independent* requirements for supplementation of the administrative record in a bid protest. In *Global Computer Enterprises*, the court took judicial notice of certain publicly available, extra-record materials, which were proffered by the plaintiff, only *after* concluding that "the agency-produced administrative record d[id] not permit meaningful judicial review," 88 Fed. Cl. at 62, and that supplementation was warranted, *id*. at 63.

- 12 -

      In turn, the court is left with nothing but plaintiff's innuendo and unfounded suspicions, absent any factual basis within or without the administrative record. Such unfounded allegations cannot rebut the strong presumption of regularity and good faith to which defendant is entitled.

### III. CONCLUSION

      For the foregoing reasons, the court holds that FEMA's cancellation of the solicitation does not violate any statute or regulation, and otherwise rests upon a reasonable basis, adequately documented in the agency's contemporaneous records, and untainted by any evidence of bad faith. Accordingly, defendant's motion for judgment on the administrative record is **GRANTED**, and plaintiff's motion for judgment on the administrative record is **DENIED**.

      The Clerk is directed to take the necessary steps to dismiss this matter.

      **IT IS SO ORDERED.**

*s/ Lawrence J. Block*
**Lawrence J. Block**
**Judge**

# APPENDIX

### Explanation for Redactions

This opinion originally issued under seal on February 3, 2010. The court afforded the parties an opportunity to propose redactions in the published opinion. Defendant proposed extensive redactions of what it characterized as "'protected information' as that term is defined in the November 16, 2009 protective order entered in this case." Def.'s Mot. to Redact at 1. Plaintiff opposed any redaction and moved for publishing the sealed opinion in its entirety, arguing that it "contains no material requiring protection from public disclosure." Pl.'s Mot. To Unseal at 1. For the reasons that follow, the court rejects most, though not all, of defendant's proposed redactions.

The court's analysis begins with "the presumption of public access to judicial records." *Baystate Techs., Inc. v. Bowers,* 283 Fed. Appx. 808, 810 (Fed. Cir. 2008) (Table) (citing *Siedle v. Putnam Invs., Inc.*, 147 F.3d 7, 9 (1st Cir. 1998)); *see Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 599 (1978) (assuming that the "common-law right of [public] access" applied to the tape recordings in that case). As the Supreme Court observed in *Nixon*, "the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." 435 U.S. at 597. This common-law right of access flows, in part, from the premise that "public monitoring of the judicial system fosters the important values of quality, honesty and respect for our legal system." *Bowers,* 283 Fed. Appx. at 810 (quoting *Siedle*, 147 F.3d at 9–10).

Yet the public's "right to inspect and copy judicial records is not absolute." *Nixon,* 435 U.S. at 589. The right "extends, in the first instance, to materials on which a court relies in determining the litigants' substantive rights." *FTC v. Standard Fin. Mgmt. Corp.,* 830 F.2d 404, 407 (1st Cir. 1987) (internal citations and quotation marks omitted). Although the right is otherwise "vibrant, . . . [i]mportant countervailing interests can, in given instances, overwhelm the usual presumption and defeat access." *Siedle*, 147 F.3d at 10. The Federal Circuit has held that, in determining whether previously sealed court records should be made available to the public, "the court must balance the privacy interests of the parties against the public interest in access to the . . . information." 283 Fed. Appx. at 810 (remanding to the trial court for the requisite balancing); *see Akal Sec., Inc. v. United States*, 87 Fed. Cl. 311, 314 n.1 (2009) (citing the *Bowers* balancing requirement before deciding to accept "some, but not all, of defendant's proposed redactions"). Accordingly, in deciding which, if any, of defendant's proposed reactions are appropriate, the court must balance the public interest in access against any putative private interest in maintaining the confidentiality of the information in question.

The protective order in this case defines "protected information" as "any information that must be protected [from public disclosure] in order to safeguard the competitive process, including source selection information, proprietary information, and confidential information." Prot. Order ¶ 1. Notably, defendant's proposed redactions include no proprietary or confidential information of any contractor or other private entity, but, rather, are limited to information concerning changes in defendant's procurement needs. During the course of this matter, defendant sought to keep this information under seal on the apparent ground that public disclosure would provide *plaintiff* with advance notice of the scope of defendant's future solicitation and thus an unfair advantage over its

competitors. *See, e.g.*, Pl.'s Dec. 18, 2010 Objection to Designation of Protected Info. at 2. Though not wholly specious, this is a tenuous argument.

To be sure, plaintiff will be the first contractor to learn of any information in this published opinion. The particular facts of this case—a cancelled solicitation with no third-party awardee that would have a vested interest in the court's decision—along with the protracted procedural history, *see infra*, also persuade the court that few of plaintiff's competitors would be following this litigation or keen to scour the court's opinion for information about a possible future solicitation. Therefore, public disclosure of the information in question may, as a hypothetical matter, operate as a selective disclosure to plaintiff. Yet, as illustrated below, much of this information is described in such broad, qualitative terms that, while legally significant, would be of little use to a prospective contractor. Any competitive advantage that plaintiff might gain, by its hypothetically selective access to this information, would thus be marginal. Weak, therefore, are the private interests—namely, the interests of plaintiff's competitors in keeping the information under seal—against which the court must weigh the public's interest in access. Moreover, *most* of the information that defendant has proposed for redaction is pertinent to the court's determination of plaintiff's substantive rights, *see infra*, a fact that heavily favors public disclosure, *see Anderson,* 805 F.2d at 13. Accordingly, the balance of the public and private interests, in this case, weighs in favor of rejecting the vast majority of defendant's proposed redactions, as follows.

First, some of the information proposed for redaction is wholly ineligible for protection. *See* Prot. Order ¶ 1. For example, it is inconceivable that the very existence of an intra-agency memorandum could be confidential, proprietary, or otherwise constitute protectable information. *Id*. Likewise ineligible for protection are excerpts quoted from this same memorandum, which excerpts repeat information that defendant is content to leave unredacted elsewhere in the opinion. The court cannot imagine how the memorandum's sheer phraseology could communicate additional information, let alone information that is confidential or competition-sensitive. *Id.*

Second, other information about changes in defendant's procurement needs, though nominally confidential, is described only in qualitative terms. A prime example is the decision by defendant's agency to task a significant number of its own employees with work formerly slated for private contractors. Such information could only be of limited value to plaintiff, or to any prospective contractor, in anticipating the scope of defendant's future solicitation. Yet this information is pertinent to the court's determination of the merits of plaintiff's claim, s*ee infra*. Accordingly, the balance of the public interest in access, weighed against the private interests of plaintiff's competitors, heavily favors public disclosure of this information.

The court is persuaded, however, that the balance weighs *against* public disclosure as to one piece of information, namely, the *precise number* of those temporary housing sites included in the cancelled solicitation that will not be closed, and which defendant plans to include in its future procurement. It is conceivable that this information could be of value to plaintiff in any advance bid preparation efforts. Public disclosure of this information—which may operate as a selective disclosure to plaintiff—could thus afford plaintiff an unfair, albeit marginal, advantage over its competitors. Equally important, the precise number of sites that will be included in the future solicitation is largely incidental to the court's determination of the merits of plaintiff's protest. Accordingly, the court has redacted all references to this information; the redactions are indicated by the bracketed notation, [*number redacted*].