# United States Court of Federal Claims

No. 09-675 C
(Filed Under Seal: September 9, 2010)
**(Reissued: September 13, 2010)**[*]

| | |
|---|---|
| **Madison Services, Inc.,** | Bid protest; Rule 60(b)(2); Rule 60(b)(3); Fraud or misrepresentation; Newly discovered evidence; Presumption of regularity and good faith; Post-judgment discovery |
| *Plaintiff*, | |
| v. | |
| **United States of America,** | |
| *Defendant.* | |

*Wayne A. Keup*, Wayne A. Keup, PLLC, Washington, DC, for plaintiff.

*Devin A. Wolak*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.

## OPINION and ORDER

**BLOCK,** *Judge*.

    The court is faced with two post-judgment motions filed by plaintiff, Madison Services, Inc. The first, plaintiff's motion for relief from judgment, filed pursuant to Rule 60 of the Rules of the United States Court of Federal Claims ("RCFC"), represents plaintiff's third attempt to secure a government contract that it presumptively won from the Federal Emergency Management Agency ("FEMA") in 2009. After encountering repeated failures during the course of this bid protest, plaintiff now seeks post-judgment relief under RCFC 60(b)(2) and (b)(3). Pl.'s Mot. for Relief from J. at 1. Essentially, plaintiff's present charge against FEMA is that the agency misrepresented material facts during the course of this litigation and otherwise engaged in fraudulent conduct aimed at injuring plaintiff. *See id.* at 3–8.

    The evidence proffered by plaintiff to prove FEMA's purported animus is predicated almost solely upon a declaration from plaintiff's president, John Lange. *See* Pl.'s Mot. for Relief from J., Ex. 1 (Decl. of John W. Lange (undated)) ("Lange Declaration"). That document,

---

[*] This opinion originally was issued under seal on September 9, 2010. The court afforded the parties an opportunity to propose redactions in the opinion prior to its publication, but no such redactions were proposed. Accordingly, the opinion is herein reissued for publication, unsealed.

however, is both conclusory and self-serving, merely insinuates innuendo and raises inferences that are not supported by the record, and consequently, as a matter of law, cannot provide an evidentiary basis warranting the relief that plaintiff seeks. Throughout the proceedings in this case, plaintiff has doggedly employed a shotgun approach (unfortunately a trend in modern litigation) spraying about as many arguments as can be made no matter the worth. It is as if plaintiff is following Mason Cooley's aphorism: "If you at first don't succeed, try again, and then try something else." *Franklin Sav. Corp. v. United States*, 56 Fed. Cl. 720, 721 (2003) (quoting Mason Cooley). Clearly, quantity does not always equate with quality.

The second motion before the court is plaintiff's self-styled "Motion to Compel Production of a Complete Administrative Record." *See* Mot. to Compel Produc. of a Complete Admin. R. ("Motion to Compel") at 1. Therein, plaintiff is essentially moving for post-judgment discovery so as to lay a foundation to support the rickety edifice of the Lange Declaration and plaintiff's unsupported attorney arguments. However, no matter how lucrative the catch might be, the law will not support a fishing expedition. For the reasons detailed below, plaintiff's motions must be denied.

## I. Background[1]

FEMA is the primary federal agency tasked with responding to natural and man-made disasters. 6 U.S.C. § 313(b)(1). One of FEMA's responsibilities is to provide for housing assistance through the use of mobile homes termed "temporary housing units" ("THUs"). 42 U.S.C. § 5174.

Significantly, one of the many side effects of Hurricane Katrina was mass tort litigation over formaldehyde levels in THUs that allegedly sickened the inhabitants. Def.'s Resp. to Pl.'s Mot. for Relief ("Def.'s Resp") (citing *In Re FEMA Trailer Formaldehyde Product Liability Litigation*, No. 2:07-mid-01873-KDE-ALC (E.D. La.), Appendix ("A") at 10). As a consequence, FEMA abstained from using or disposing of THUs, resulting in increasingly high inventories of temporary housing. *Id.* This is uncontroverted.

Also uncontroverted is that, prior to 2009, FEMA contracted with both Alutiiq Global Services ("Alutiiq") and TMI Management Services ("TMI") to administer the agency's THU program. Def.'s Resp., App. at 1–2. Alutiiq's obligation was to maintain a ready inventory of THUs, while TMI was tasked with disposing of formerly used THUs after the lapse of habitation. Def.'s Resp. at 4–5. These contracts terminated on December 29, 2009. *Id*. The origin of the instant multistage litigation began with FEMA's decision to combine the services provided by Alutiiq and TMI into one contract. *See id*., App. at 2, 5. Indeed, on April 10, 2009, FEMA issued Request for Proposals No. HSFEHQ-09-R-0046 (the "RFP" or "Solicitation") for

---

[1] Because this is the third published opinion in this case, the court assumes familiarity with the factual background and presents only a brief recitation of the facts. For a more detailed account of the factual and procedural history, see *Madison Servs., Inc. v. United States*, 90 Fed. Cl. 673 (2009) ("*Madison I*") and *Madison Servs., Inc. v. United States*, 92 Fed. Cl. 120 (2010) ("*Madison II*").

the combined services related to the maintenance, transportation and disposal of THUs. Admin. R. ("AR") 694.

After consideration of the submitted proposals, FEMA informed plaintiff that it was the intended awardee. *Madison I*, 90 Fed. Cl. at 676. Before final award of the contract, however, TMI filed a protest with the Government Accountability Office ("GAO"), arguing that FEMA had issued the Solicitation under a classification code inappropriate to the services procured. *TMI Mgmt. Sys., Inc.*, B-401530, 2009 CPD ¶ 191 at *2 (Comp. Gen. Sep. 28, 2009). GAO agreed and, on September 28, 2009, sustained TMI's protest, finding that FEMA had used an improper classification code, thereby precluding full competition. *Id.* at *4. GAO recommended that FEMA reissue the Solicitation using a different classification code in accordance with GAO's opinion. *Id.*

On October 7, 2009, a mere nine days after the GAO decision, and before FEMA had an opportunity to render a final decision regarding what course of action to take, plaintiff filed the instant protest, preemptively challenging FEMA's tentative plans to follow GAO's recommendation. *See Madison I*, 90 Fed. Cl. at 676. Plaintiff argued that FEMA's original classification code was reasonable, that GAO was erroneous in finding otherwise, and that FEMA's intention to follow GAO's recommendation was itself unreasonable. *Id.* at 676–77. Like many a fruit plucked too early, this apple, from which plaintiff's first bite was taken, was unripe. The court granted defendant's RCFC 12(b)(1) motion to dismiss plaintiff's original claims, holding that "plaintiff's original protest has never been ripe for the court's review, because no final agency decision to reissue the solicitation has ever been before the court."[2] *Id.* at 679–80.

Nevertheless, litigation continued because the court was concurrently faced with plaintiff's cross-motion to amend its complaint; that motion was predicated upon plaintiff's challenge to FEMA's decision to cancel the Solicitation. Pl.'s Mot. for Leave to Amend Compl. at 1; *Madison I*, 90 Fed. Cl. at 677. This cancellation was based upon an October 28, 2009 memorandum from FEMA's Logistics Management Directorate ("LMD").[3] AR 763. LMD requested that the contracting officer cancel the Solicitation due to FEMA's "accelerated [THU] site closure plan" and the "hir[ing] [of] a significant number of FEMA employees to fulfill the daily operational roles" at the THU sites, all of which appeared to make the Solicitation redundant, if not completely unnecessary. AR 763. To be sure, based upon the LMD memorandum, FEMA's contracting officer cancelled the Solicitation on November 4, 2009; the cancellation notice explained that "[t]he solicitation does not [now] accurately reflect the FEMA's requirements and an amendment to this solicitation would be so substantial as to exceed what prospective offerors could have anticipated." AR 765; *see Madison II*, 92 Fed. Cl. at 124.

---

[2]The court alternatively held that FEMA's subsequent decision to cancel, rather than to reissue, the Solicitation rendered plaintiff's original claims moot. *Madison I*, 90 Fed. Cl. at 680.

[3]LMD "is FEMA's major program office responsible for policy, guidance, standards, execution and governance of logistics support, services and operations. [LMD's] mission is to effectively *Plan, Manage and Sustain* the national logistics response and recovery operations, in support of domestic emergencies and special events . . . ." LMD Fact Sheet *available at* http://www.fema.gov/media/fact_sheets/lmd.shtm (emphasis in original).

It is important to note that, shortly after the cancellation, FEMA determined that a short-term bridge contract was necessary in order to allow the THU program to continue. Def.'s Resp., App. at 3, 7–8. FEMA determined that, due to the imminent expiration of its then-existing contracts with TMI and Alutiiq, competition for the bridge contract would have to be conducted within a shorter time-frame than would be feasible with a negotiated procurement conducted pursuant to Part 15 of the Federal Acquisition Regulation ("FAR").[4] *Id*., App. at 3. Accordingly, FEMA decided to solicit the bridge contract pursuant to Part 8 of the FAR, with competition limited to businesses holding a Federal Supply Schedule ("FSS") contract; this would allow FEMA to complete the acquisition within a short time-frame.[5] *Id*. On November 23, 2009, FEMA issued its Request for Quotation ("RFQ") pursuant to FAR 8.4. *Id*. Plaintiff was not invited to compete for the bridge contract, because it did not hold a FSS contract and was thus ineligible to compete. *Id*. The competition was complete in less than 45 days, and, on December 18, 2009, FEMA awarded the bridge contract to TMI. *Id*.

As the foundation of its proposed complaint amendment, plaintiff maintained that there was no need for FEMA to cancel the Solicitation, a cancellation justified by FEMA's need to accommodate increasingly necessary THU site closures, because such site closures were specifically permitted by the Solicitation. Am. Compl. ¶ 29. Plaintiff, accordingly, sought to add new claims alleging that FEMA's cancellation decision was unreasonable and that plaintiff should be declared the contract-awardee of the resurrected Solicitation. Am. Compl. ¶¶ 25–36. The court, in *Madison I*, though dismissing plaintiff's original claims, granted plaintiff's motion to amend its complaint with the new claims challenging the cancellation decision, because such motions, generally, are liberally construed. *See Madison I*, 90 Fed. Cl. at 680–83.

At the next stage of the litigation, the parties filed cross-motions for judgment on the administrative record, pursuant to RCFC 52.1. For its part, plaintiff argued that FEMA's decision to cancel the Solicitation lacked a rational basis. *Madison II*, 92 Fed. Cl. at 124. Alternatively, plaintiff argued that FEMA's justifications for the cancellation were a subterfuge and that the cancellation decision was, in fact, motivated by bad faith and animus toward plaintiff. *Id.* at 124–25. After declining to hold oral argument, the court, on February 3, 2010, issued the *Madison II* opinion. Therein, the court concluded that FEMA's decision to cancel the Solicitation was reasonable and fully in accordance with law. *Id.* at 128–29. The court based its

---

[4] Negotiated procurement under FAR Part 15 is a multi-stage process with numerous steps to be followed and time periods to be observed. *See* FAR 15.000–15.509. Among other things, agencies must provide for competition, develop a solicitation, publicize the contract action, and conduct a source selection. *Id*.

[5] In contrast to negotiated procurements under FAR Part 15, proceeding under FAR Part 8 allows for expedited procurement. The FSS program provides agencies with a simplified process for procuring commercial supplies and services at prices already negotiated by the General Services Administration ("GSA"). *See* FAR 8.401–8.406. In such instances, the procuring agency does not have to negotiate every aspect of the prospective contract, because GSA has already negotiated most of the material terms. *See Navarro Research and Eng'r, Inc. v. United States*, No. 10-481, 2010 WL 3228289, at *2 (Fed. Cl. Aug. 16, 2010) (describing soliciation procedures under FAR Part 8).

ruling primarily upon FEMA's representations that it anticipated drastically reducing the number of THU sites and increasing the number of its own personnel devoted to THU services, both of which changes would annul the need for the services procured under the Solicitation. *Id.* at 127. Regarding plaintiff's bad faith arguments, the court was "left with nothing but plaintiff's innuendo and unfounded suspicions, absent any factual basis within or without the administrative record." *Id.* at 131. The court concluded that these "unfounded allegations" were insufficient to "rebut the strong presumption of regularity and good faith" to which defendant is entitled. *Id.* Therefore, the court granted defendant's motion for judgment on the administrative record and denied plaintiff's cross-motion. *Id.*

Undeterred, plaintiff thereafter filed the instant Rule 60 motion for relief from judgment, essentially its third bite at the apple. In this motion, plaintiff claims that "[e]vidence recently discovered by [plaintiff] indicates clearly that the [d]efendant's explanations for its actions in this procurement were inaccurate," and that "[d]efendant misrepresented the current status of its requirements and its procurement intentions to the [c]ourt." Pl.'s Mot. for Relief at 3.

As noted above, plaintiff's ostensible "new evidence" consists of an undated declaration from its president, John Lange. Plaintiff maintains that it is entitled to relief from the court's judgment because the Lange declaration allegedly demonstrates that: (1) unbeknownst to the court, defendant made materially false representations during the course of this litigation, representations upon which the court relied in concluding that FEMA's needs had materially changed, *id.* at 4–6; (2) defendant knew that its representations were false, *id.* at 6, 8; and (3) defendant made these knowingly false representations to "specifically injure [plaintiff] by depriving it of the contract for which it had been selected," *id.* at 7–8. For these reasons, plaintiff asks the court to vacate its prior judgment, to direct FEMA to supplement the administrative record with all documents relating to the bridge contract awarded to TMI, and to conduct a hearing on all pending issues. *Id.* at 7–8.

In its motion to compel, plaintiff essentially argues that FEMA's cancellation of the Solicitation and its subsequent award of the bridge contract to TMI were inextricably linked and part of a grand plan. *Id*. at 1–2. On that ground, plaintiff seeks to compel defendant to produce a laundry list of documents ostensibly demonstrating the link between FEMA's cancellation of the Solicitation and its subsequent bridge contract with TMI. *Id.* at 3–4. Plaintiff argues that this discovery is "essential to the [c]ourt's effective judicial review" of plaintiff's Rule 60 motion for relief from judgment. *Id.* at 3.

As alluded to in the introduction, and as fully explained below, the Lange Declaration is woefully insufficient to support the contentions made in plaintiff's Rule 60 motion and thus falls far short of the level necessary to warrant relief from judgment. Additionally, based upon the evidence before the court, including the Lange Declaration, post-judgment discovery is inappropriate. Accordingly, the court must deny both of plaintiff's post-judgment motions.

## II. Plaintiff's Rule 60 Motion for Relief from Judgment

*A. Legal Standards*

Initially, it should be noted that relief from judgment pursuant to Rule 60(b) is an extraordinary remedy only to be granted in exceptional circumstances. *Webster v. United States*, No. 09-81, 2010 WL 2904641, *2 (Fed. Cl. July 26, 2010); *Yachts America, Inc. v. United States*, 8 Cl. Ct. 278, 281 (1985). The decision to grant such relief rests in the sound discretion of the court, and the court "may weigh equitable considerations in the exercise of [that] discretion." *Dynacs Eng'g Co. v. United States*, 48 Fed. Cl. 240, 241 (2000). To be sure, this relief will only be granted if the judgment harms the movant's substantial rights. *Id.*

Rule 60(b) provides that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding" for any of several reasons, including "(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under RCFC 59(b)," and "(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." Plaintiff alleges that its proffered new evidence relates to both subparts (2) and (3) of Rule 60(b). Pl.'s Mot. for Relief at 1.

Under Rule 60(b)(3), a movant must demonstrate fraud, misrepresentation, or misconduct by "clear and convincing evidence." *E.g.*, *Venture Indus. Corp. v. Autoliv ASP, Inc.*, 457 F.3d 1322, 1333 (Fed. Cir. 2006); *Dynacs Eng'g Co.*, 48 Fed. Cl. at 242 (citing 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane § 2860, at 311–13). In addition, the movant must show that the fraud or misconduct prevented the movant from receiving a fair hearing or trial. *Hutchins v. Zoll Med. Corp.*, 492 F.3d 1377, 1386 (Fed. Cir. 2007).

To warrant relief under Rule 60(b)(2), the moving party "must show that the newly discovered evidence, if introduced at trial, clearly would have produced a different result if presented before the original judgment." *Venture Indus.*, 457 F.3d at 1328 (internal citations and quotation marks omitted); *Placeway Constr. Corp. v. United States*, 19 Cl. Ct. 484, 489 (1990). Here, in seeking relief pursuant to Rule 60(b)(2), plaintiff argues that its so-called new evidence proves its original claim of pretext and bad faith, a claim that the court addressed and dismissed in *Madison II*. Pl.'s Mot. for Relief at 4–7. Thus, in order to show that this new evidence clearly would have produced a different outcome, plaintiff must show that this evidence suffices to overcome the presumption of regularity and good faith safeguarding legitimate agency actions. *See, e.g.*, *Am-Pro Protective Agency v. United States*, 281 F.3d 1234, 1238–39 (Fed. Cir. 2002) ("*Am-Pro*") (noting the strong presumption that government officials act in good faith); *Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d 1578, 1581 (Fed. Cir. 1995) (same). Plaintiff can overcome this presumption only by "clear and convincing evidence." *Am-Pro*, 281 F.3d at 1239–40; *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004).

Accordingly, given the facts of this case and the particular arguments advanced by plaintiff, in order to obtain relief from the court's prior judgment, whether under Rule 60(b)(2) or (b)(3), plaintiff must demonstrate, by clear and convincing evidence, that FEMA engaged in fraud, misrepresented material facts, or otherwise acted in bad faith. Because plaintiff submits as

evidence unsubstantiated innuendo and uncorroborated inferences, evidence that categorically cannot meet a "clear and convincing" standard, the court must deny plaintiff's requests for relief. *See Int'l Res. Recovery, Inc. v. United States*, 61 Fed. Cl. 38, 43 (2004) ("allegations of bad faith must be based on hard facts").

## B. The Parties' Arguments

### 1. Plaintiff's Arguments

The Lange Declaration is essentially the only proffered support for plaintiff's claim of agency bad faith. In plaintiff's view, such bad faith is provable by demonstrating that FEMA misrepresented the facts and otherwise lied to the court, when it maintained that FEMA's need for THU services had diminished to a level necessitating cancellation of the Solicitation. *See supra* Background. This allegation of bad faith, however, is merely a conclusion drawn from speculation as to the existence of certain occurrences, as well as actions and motives of certain characters in this three-act play. *See* Pl.'s Mot. for Relief at 4–7.

To be fair, plaintiff, in essence, if not explicitly, does at least allege that FEMA's justification of changed needs was really a subterfuge masking FEMA's latent animosity toward plaintiff. But it is one thing to allege, it is another to prove. For its proof, plaintiff basically spins three inferences drawn from the Lange Declaration and then weaves a smorgasbord of steps to account for the alleged bad faith and fraudulent behavior. Unfortunately for plaintiff, neither speculation, nor the drawing of an inference to support such speculation, generally rises to the needed level of clear and convincing evidence.

The first inference that plaintiff draws is that there never was any intent to reduce THU services, the reduction of which was used to justify cancellation of the Solicitation. To demonstrate this, Lange, plaintiff's president, relates various conversations he had concerning FEMA's THU services. Allegedly, several Alutiiq employees, whom Lange met at a THU auction in Baton Rouge, Louisiana, informed Lange that "a couple of months" prior, they were "transferred" to TMI. Lange Decl. ¶ 2. After learning this (and stating in his Declaration that this made him suspicious), Lange telephoned Ms. Petruzzo[6] at FEMA, who explained that, since resolicitation of the original RFP might not occur for a year to eighteen months, *id.* ¶ 4, a competition was held to "fill the jobs previously performed by Alutiiq," *id.* ¶ 6. Lange, in turn, "spoke" with the former project manager for Alutiiq, who informed Lange that, after Alutiiq's contract expired, TMI "had assumed [Alutiiq's] work at all of the THU sites." *Id.* ¶ 8. To plaintiff, these "facts," taken together, clearly show that because FEMA replaced Alutiiq with TMI in December 2009 (just two months after the LMD issued its memorandum requesting cancellation of the Solicitation), FEMA continued to need contracting services at *all* the THU sites, despite its contrary representations to this court. Pl.'s Mot. for Relief at 7.

The second inference raised by plaintiff derives from a statement by Alutiiq's former project manager concerning the number of Alutiiq employees working on its contract with

---

[6] Ms. Petruzzo was the contract specialist assigned to the Solicitation, but has since become a contracting officer. Def.'s Resp., App. at 5.

FEMA and the fact that TMI hired these workers to perform the bridge contract. The Alutiiq project manager purportedly related to Lange that when Alutiiq's contract expired at the end of December 2009, it had "approximately 140 employees working on the FEMA contract." Lange Decl. ¶ 8. From this statement and the "dollar size of TMI's 'bridge' contract," plaintiff jumps to the conclusion that "TMI likely hired that 140-person workforce and likely more to perform the base year work in the original solicitation which entailed performance of services at all 15 sites"—*i.e.,* the large work pool employed under the bridge contract shows that FEMA personnel could not wholly perform the needed services and further demonstrates that the cancellation of the Solicitation was a ploy because FEMA never intended to award a contract to plaintiff. Pl.'s Reply in Supp. of Pl.'s Mot. for Relief ("Pl.'s Reply") at 7.

Plaintiff's final inference relates to the award of the bridge contract to TMI. Basically, plaintiff alleges that, in reality, the bridge contract was an unlawful sole-source award. Pl.'s Mot. for Relief at 7. This belief is based on plaintiff's Business Development Manager's failed "attempt to locate any advertisement or solicitation" for the bridge contract. Lange Decl. ¶ 10. The Business Development Manager supposedly reported to Lange that he "found no evidence of a competition for these FEMA requirements." *Id.* From this, plaintiff infers that no such evidence existed and that therefore the contract was "secretly awarded" to TMI. Pl.'s Mot. for Relief at 7. Plaintiff concludes that "it is more likely than not that the actions taken by FEMA resulted in no competition—or extremely limited competition at best—for these requirements," as opposed to the robust competition that occurred under the cancelled Solicitation. *Id.*

From these three inferences, plaintiff draws the conclusion that FEMA lied about its reasons for cancelling the Solicitation. Pl.'s Mot. for Relief at 3–4, 6–7. The first two inferences are made to support plaintiff's proposition that FEMA's representation of changed needs was inaccurate. Specifically, plaintiff claims that FEMA misrepresented both the decrease in the number of THU sites needing services and an increase in the number of FEMA employees providing those services. Pl.'s Mot. for Relief at 7. Plaintiff attempts to provide further support for this proposition by rehashing its argument, from *Madison II*, that the Solicitation specifically allowed site reductions, thus making resolicitation unnecessary even if FEMA's representations were true. Pl.'s Mot. for Relief at 7 n.17; Pl.'s Reply at 6–7. Ultimately, the conclusion that plaintiff would like the court to draw is that FEMA's representations were an artifice designed to "specifically injure [plaintiff] by depriving it of the contract for which it had been selected for award." *Id.*

### 2. Defendant's Arguments

For the most part, defendant agrees with the bare, skeletal facts underlying the Lange Declaration, though it does not at all agree with the inferences and conclusions that plaintiff draws from these facts. Def.'s Resp. at 11. A "careful examination" of the Lange Declaration, defendant contends, "reveals nothing probative of FEMA's intentions toward [plaintiff] at any time, much less . . . when FEMA decided to cancel the solicitation." *Id.* Instead, defendant argues that there exits an innocent and reasonable explanation for these facts, an explanation that does not support plaintiff's allegations of bad faith. To support this position, defendant offers

declarations, attached to is respo from three FEMA employees who were personally involved in the events at issue.[7]

Relying on these declarations, defendant characterizes plaintiff's interpretation of the Lange Declaration as strained and full of fanciful conclusions, and points out that the Declaration itself is littered with unreliable hearsay. For instance, defendant notes that the conversation that Lange relates between himself and several site employees occurred *at an auction of THU trailers*. *Id.* at 11. To defendant, far from being inconsistent with FEMA's stated reasons for cancelling the Solicitation, this actually reinforces them: "FEMA was doing exactly what it said it planned to do in the October 2009 LMD memorandum—disposing of its THU inventory during fiscal year 2010." *Id.* Furthermore, defendant contends that the Lange Declaration is littered with hearsay and factual inaccuracies based on supposition, not personal knowledge. *See,e.g.*, *id.* at 11–12 (statements of site workers are "supposition based on hearsay"), 13 (statements by Alutiiq's former project manager are "entirely hearsay" and lack corroboration or personal knowledge).

Similarly, defendant contends that plaintiff reads too much into the unsuccessful search by plaintiff's Business Development Manager. While not doubting that plaintiff's Business Development Manager performed the search, defendant points out that the lack of results is not indicative of a secret award. *Id.* at 13–14 (the failure to locate such evidence "does not establish the non-existence of such evidence."). Ironically, such an inference is unwarranted, defendant contends, because plaintiff itself later found and presented to the court evidence of a public competition. *Id.* at 14 (referring to the supplement to plaintiff's motion for relief, filed April 14, 2010).

In defendant's view, the Lange Declaration can fairly be reduced to only four "hard" facts: (1) "FEMA is disposing of its excess THU inventory;" (2) "[i]n February 2010, TMI was performing at the Baton Rouge" THU site; (3) Ms. Petruzzo informed Lange that TMI was performing on a contract it won after a competition, and that resolicitation of the original RFP, while still planned, had not yet been scheduled; and (4) Alutiiq was, as of late December 2009, no longer providing THU services to FEMA. *Id.* at 14. These "hard" facts, defendant contends, are consistent with its proffered justification for cancelling the Solicitation and with its overall position throughout the course of this litigation. *Id*. at 14–15.

Thus, defendant argues that there simply was no "secret" or sole-source award. As defendant describes it, in November 2009, FEMA was faced with the fast-approaching prospect of losing vital THU support services after expiration of the existing contracts at the end of December 2009. *Id*. at 7–8, 15. Defendant also points out that the delays in FEMA's resolicitation of the THU services at issue were, in part, caused by the instant litigation. *Id*. at 2,

---

[7] The three declaration are from: (1) Carolyn Abney, the contracting officer for the Solicitation, Decl. of Carolyn Abney ¶¶ 1, 5 (Apr. 22, 2010) (attached to Def.'s Resp.); (2) Mary Petruzzo, the contract specialist for the Solicitation, Decl. of Mary Petruzzo Decl. ¶ 2 (Apr. 22, 2010) (attached to Def.'s Resp.); and (3) Jeb Bishop, the THU program manager and chair of the source selection board for the Solicitation, Decl. of Jeb S. Bishop ¶¶ 1–2 (Apr. 22, 2010) (attached to Def.'s Resp.).

15. As a result of this, FEMA had little choice but to conduct an accelerated procurement under Part 8 of the FAR, as noted above. *Id.*

That competition resulted in the award of a bridge contract that would, according to defendant, fulfill FEMA's present needs and allow FEMA to reduce its supply of THUs, determine revised long-term needs, and, with such information at hand, conduct a new solicitation. *Id*. at 7–8. Significantly, defendant refutes plaintiff's assertion that the bridge contract was awarded "in lieu of the competition requested in the LMD memorandum." Def.'s Resp. at 13. Rather, defendant explains that the bridge contract has nothing to do with "the subject of [plaintiff's] protest," and "was not intended to replace the reduced-scope THU service contract requested in the October 2009 LMD memorandum," but merely meets the agency's interim needs. Def.'s Resp. at 16. The point defendant stresses is that resolicitation of the original RFP would be a waste of public funds until FEMA's planned THU reductions are complete and FEMA can better assess its long-term needs. Def.'s Resp. at 16–17, App. at 12.

## C. *Plaintiff Has Failed To Carry Its Burden*

It is worth stating the appropriate black-letter law: driven by the highly deferential "arbitrary and capricious" standard, reviewing courts must give great latitude to decisions of government agencies unless made outside the bounds of reason or law. *See, e.g.*, *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001); *USfalcon, Inc. v. United States*, 92 Fed. Cl. 436, 449 (2010); *Overstreet Elec. Co., Inc. v. United States*, 59 Fed. Cl. 99, 117 (2003). This is particularly true when an agency's mission— such as FEMA's mission of responding to emergent disasters or preparing for future ones, whether natural or man-made, 6 U.S.C. § 313(b)—serves such a vital public interest. *See generally Salazer v. Buono*, 130 S.Ct. 1803, 1816 (2010) (noting that "a court should be particularly cautious when contemplating relief that implicates public interests"). To be sure, part of that mission is to provide individuals with temporary housing, such as THUs, in the wake of a disaster. 6 U.S.C. § 314(a)(8); 42 U.S.C. § 5174. Accordingly, the court should not, without *compelling cause*, hamstring the actions of an agency tasked by statute with alleviating the effects of disasters, providing for public safety, and saving lives.

In attempting to show this compelling cause for its attack on the administration of FEMA's vital THU program, plaintiff bandies about allegations of bad faith, fraud and misrepresentation of material facts by FEMA, all allegedly aimed at injuring plaintiff by denying it the fruits of the possible contract award under the cancelled Solicitation. However, as fully discussed above, to prevail under either Rule 60(b)(2) or (b)(3) in this instance, plaintiff must proffer clear and convincing evidence to rebut the presumption of governmental regularity and good faith. *See Am-Pro*, 281 F.3d at 1239–40; *Galen Med.*, 369 F.3d at 1330.

There is no need to repeat plaintiff's innuendo and various conclusions drawn from inferences. Mere innuendo and inference can never overcome the burden imposed by the clear and convincing evidence standard, the traditional heightened standard for proving common law fraud, which is indeed an exacting burden**.** *Am-Pro*, 281 F.3d at 1239–40; *United Enterprises & Assoc. v. United States*, 70 Fed. Cl. 1, 24 (2006). Certainly the arguments made by plaintiff here (arguments that are unsupported by *any* hard facts) do not rise to the level of even reasoned

speculation. *See Int'l Res. Recovery, Inc*, 61 Fed. Cl. at 43 (2004) ("allegations of bad faith must be based on hard facts"); *Madison II*, 92 Fed. Cl. at 130 (same). And defendant is correct to note that much of what is presented in the Lange Declaration is unreliable hearsay. *See Planet Space Inc. v. United States,* 90 Fed. Cl. 1, 9 (2009) (declining to consider hearsay evidence); *Global Computer Inc. v. United States*, 88 Fed. Cl. 52, 70 (2009) (same). The intrinsic unreliability of innuendo, inference and hearsay is enough here to sink plaintiff.[8]

Furthermore, the court recognizes that defendant has provided cogent reasons, supported by declarations from FEMA employees with personal involvement in critical events, that refute nearly all of plaintiff's assertions. Once again the court must state the obvious: plaintiff has not proffered any solid evidence to refute facts contained in these sworn declarations by FEMA employees, let alone clear and convincing evidence that would overcome the presumption of regularity and good faith. In the final analysis, all plaintiff has to support its arguments are the Lange Declaration's uncorroborated, self-serving and conclusory assertions, all based, in turn, upon mere inference. The law generally is to reject such "evidence." *See, e.g.*, *SEC v. Phan*, 500 F.3d 895, 909–10 (9th Cir. 2007) (holding that that self-serving and conclusory affidavits that are not based on a declarant's personal observation or knowledge are not sufficient to overcome summary judgment); *Young-Montenay, Inc. v. United States*, 15 F.3d 1040, 1042–43 (Fed. Cir. 1994) (same); *Abbey v. United States*, 82 Fed. Cl. 722, 726 (2008) (same).

### III. Plaintiff's Motion To Compel

With a denial of plaintiff's Rule 60(b) motion, this case is over. *See*, e.g., *Szabo Food Serv., Inc. v. Canteen Corp.*, 823 F.2d 1073, 1078 (7th Cir. 1987) (stating that once final judgment is entered the court loses jurisdiction unless deciding a timely motion under Rule 52, 59, or 60). Nonetheless, given plaintiff's penchant for litigation and a possible successful appeal that overturns the court's Rule 60(b) denial, it is perhaps appropriate to discuss plaintiff's motion to compel, through which plaintiff is essentially moving for post-judgment discovery. *See* Pl.'s Mot. to Compel at 3–4. It should be noted that decisions concerning discovery are left to the discretion of the trial court. *See, e.g.*, *In re Deutsche Bank Trust Co. Americas*, 605 F.3d 1373, 1377 (Fed. Cir. 2010). Some courts have held that a trial court "may require the moving party to make some evidentiary showing of fraud before granting post-trial discovery or an evidentiary hearing." *Jones v. Ill. Cent. R.R. Co.*, Nos. 09-5504, 09-5528, 2010 WL 3304306, *9 (6th Cir.

---

[8] Additionally, the Lange Declaration does not make any showing of a specific intent on the part of FEMA to harm plaintiff. *See Am-Pro*, 281 F.3d at 1239–40 (requiring clear and convincing evidence of specific intent to injure a plaintiff, in order to show fraud and other forms of bad faith); *Galen Med.*, 369 F.3d at 1330 (same). The only explicit attempt to make such a showing comes from an assertion by plaintiff's counsel that "[w]hat occurred here demonstrates a lack of good faith on the part of the Defendant designed to specifically injure [plaintiff] by depriving it of the contract for which it had been selected for award following a full and open competition." Pl.'s Mot. for Relief at 7. Of course, such attorney arguments are not evidence, let alone evidence of a specific intent to injure. Plaintiff's proffered evidence—the Lange Declaration— does not contain reliable hard evidence that FEMA intended to single out plaintiff for ill treatment.

Aug. 24, 2010); *see also Griffin v. Foley*, 542 F.3d 209, 223 (7th Cir. 2008); *Duhaime v. John Hancock Mut. Life Ins. Co.*, 183 F.3d 1, 7–8 (1st Cir. 1999).

Even taking into consideration the Lange Declaration (which was proffered only in support of plaintiff's Rule 60 motion for relief from judgment, not plaintiff's motion to compel), plaintiff has not met its burden of producing some reliable evidence to give the court an iota of justification for ordering additional discovery. Even if offered as support for plaintiff's motion to compel, the Lange Declaration falls far short of showing misconduct by FEMA, as previously discussed.

And the only other support that plaintiff proffers lies in the contentions of its counsel, which cannot form a foundation for the court's ruling. *See Gilda Indus. Inc. v. United States*, 446 F.3d 1271, 1281 (Fed. Cir. 2006); *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1581 (Fed. Cir. 1989) (attorney argument is no substitute for evidence); *In re Budge Mfg. Co.*, 857 F.2d 773, 776 (Fed. Cir. 1988) (same). What is being offered is the bald statement that, from the time of the LMD memorandum, FEMA had a master plan to cancel the Solicitation and issue a bridge contract to TMI. Pl.'s Mot. to Compel at 1–2. Also asserted is the complimentary allegation that this purported master plan was fraudulently hidden from the court and that FEMA actively misrepresented its true requirements to the court. *Id.* at 3. Yet these are mere arguments. And mere arguments cannot replace the need to submit at least some hard evidence. *See O'Connor v. United States*, 60 Fed. Cl. 164, 168 (2004) (citing *Levi Strauss & Co. v. Genesto Inc.*, 742 F.2d 1401, 1404 (Fed. Cir. 1984)).

Finally, plaintiff's request for documents relating to the bridge contract, absent some justifying evidence, is nothing more than an attempt to seek license to engage in a fishing expedition; the court cannot grant such license. *See Bowie v. Maddox*, 677 F. Supp. 2d 276, 285 (D.D.C. 2010) ("Plaintiff has so far presented only bare allegations and evidence that points to the mere possibility of fraud on the court, but presents no evidence that makes his claim 'appear to be true.' To permit discovery now would be to subject defendant to a costly and time-consuming process without an iota of rational justification, and the Court will not engage in such an abuse." (internal citation omitted)). For all of these reasons, plaintiff's motion to compel must be denied.

### IV. Conclusion

For the reasons stated above, plaintiff's RULE 60 MOTION for relief from judgment, and plaintiff's MOTION TO COMPEL are both DENIED. All OTHER PENDING MOTIONS are DENIED-AS-MOOT.

**IT IS SO ORDERED.**

s/ *Lawrence J. Block*
Lawrence J. Block
Judge